

LAW OFFICES OF SIMON HARTER, ESQ.
Simon Harter (SH-8540)
304 Park Avenue South – 11th Floor
New York, New York 10010
(212) 979-0250 – Phone
(212) 979-0251 – Fax
Attorneys for Plaintiff,
SOUTHERN CHARTERING (PTY.) LIMITED

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
SOUTHERN CHARTERING (PTY.) LIMITED,   :

             Plaintiff,   :

                       :

       -against-   :      **VERIFIED COMPLAINT**

SAMCHROME LTD.,   :

            Defendant.   :
-----------------------------------------------------------------x

Plaintiff, SOUTHERN CHARTERING (PTY.) LIMITED, by its Attorneys, Law Offices of Simon Harter, Esq., as and for its Verified Complaint against the named Defendant, SAMCHROME LTD., alleges upon information and belief as follows:

1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, in that it involves claims for breach of a maritime contract of charter party. This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333, and this Court's federal question jurisdiction pursuant to 28 U.S.C. §1331. Finally, this Court also has jurisdiction over this matter because the action also arises under the Federal Arbitration Act, 9 U.S.C. § 1,

*et seq.*, and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. § 201 *et seq.*

2.    At all times relevant hereto, Plaintiff, SOUTHERN CHARTERING (PTY.) LIMITED (hereinafter "Plaintiff") was and still is a foreign business entity organized and existing under the laws of a foreign country with a registered office at PO Box 8370, Johannesburg, 2000, South Africa.

3.    At all times relevant hereto, Defendant, SAMCHROME LTD. (hereinafter "Defendant"), was and still is believed to be a foreign business entity organized and existing under the laws of a foreign country with a registered office and/or principal place of business at 2nd Floor, Europa Centre, St. Anne Str., Floriana, VLT16, Malta.

4.    On or about September 18, 2007, Plaintiff, in the capacity as owner, entered into a maritime Contract of Affreightment with Defendant, in the capacity of charterer, pursuant to which Plaintiff agreed to let, and Defendant agreed to charter the Motor Vessel NTABENI, or suitable substitute, for the carriage of between six (6) to seven (7) cargoes of approximately 33,000 metric tons of chrome ore and/or alloy, per shipment, from Richards Bay/Maputo, South Africa to various ports in China.  A copy of the charter recapitulation is attached hereto as Exhibit "A" and incorporated by reference herein.

5.    The Contract of Affreightment called for scheduled shipments to occur in June, September, and December of 2008 and March, June, and October of 2009.  The final shipment is to occur, at Defendant's option, before the end of 2009 if the schedule allows for an additional sailing.

6.     The Contract of Affreightment set forth a formula for the calculation of freight rates to be charged to Defendant, which varied according to the type of chrome loaded, the method of loading, and the load and discharge ports.  The freight rates ranged from USD $51.50 per metric ton to USD $56.50 per metric ton of chrome product.  Because of draft restrictions, there was also an additional charge of USD $2.00 per metric ton for product discharged in Shanghai, China.

7.     Between December 2008 and May 2009, Plaintiff and Defendant discussed possible amendments to the Contract of Affreightment to alleviate the consequences of the global financial crisis, which appeared to have affected Defendant's ability or willingness to pay the freight rates provided in the Contract of Affreightment.

8.     These negotiations did not result in any concluded agreement.  However, the March 2009 shipment was performed against the backdrop of these negotiations and it was agreed that Plaintiff would invoice Defendant at a lower freight rate at that time, without prejudice to Plaintiff's right to claim the full payment, either immediately or in a form to be agreed with Defendant.  A copy of Plaintiff's correspondence to Defendant's agent reserving Plaintiff's right to recover the full freight amount is attached hereto as Exhibit "B" and incorporated by reference herein.

9.     For the March shipment, Plaintiff delivered the vessel to Defendant in a condition conforming in all respects to the requirements specified in the Contract of Affreightment.

10.     Following the loading of the vessel, Plaintiff invoiced Defendant USD $34 per metric ton for the 22,000 metric tons of chrome ore loaded at Richards Bay for

discharge at Shanghai and USD $39 per metric ton for the 12,000 metric tons of ferro alloys loaded at Richards Bay for discharge at Xingang.   In accordance with the Contract of Affreightment, the correct freight rate was USD $58.50 per metric ton.

11.    Applying the correct freight rate, less commission, the total due Plaintiff for the March shipment was USD $1,914,412.50.

12.    Of the total freight due Plaintiff, Defendant paid USD $1,170,400.00, resulting in a balance due Plaintiff in the amount of USD $744,012.50.

13.    Following the March payment, and while continuing the aforementioned negotiations, Defendant performed a voyage with Plaintiff under a separate charter party contract which ultimately provided for an overpayment in the amount of USD $167,681.90 to be made by Defendant, in partial payment of Defendant's outstanding liability to Plaintiff.

14.    Upon application of the overpayment, there remains a balance due Plaintiff in the amount of US $576,330.60 ($744,012.50 due from the March shipment minus $167,681.90 overpayment).

15.    By virtue of its failure to pay freight in the full amount due, Defendant is in breach of the Contract of Affreightment.

16.    Despite demand for payment, Defendant has failed to make payment in the amount now due and owing under the Contract of Affreightment.

17.    In further breach of the Contract of Affreightment, on or about June 4, 2009, Defendant wrongfully cancelled the scheduled June 2009 shipment.   A copy of

this correspondence, through Defendant's agent, is attached hereto as Exhibit "C" and incorporated by reference herein.

18.    Plaintiff was able to mitigate its damages by chartering the vessel to another entity. However, due to the decrease in freight rates in the market, Plaintiff's charter of the vessel was at a rate significantly less than the rates between Plaintiff and Defendant as outlined in the Contract of Affreightment.

19.    As a consequence of the foregoing, and taking into consideration Plaintiff's mitigation earnings, Plaintiff has suffered damages totaling US $579,431.66, representing loss of earnings due to Defendant's wrongful cancellation of the June shipment. A copy of Plaintiff's calculations for damages resulting from the cancelled June shipment is attached hereto as Exhibit "D" and incorporated by reference herein.

20.    The Contract of Affreightment, as evidenced by the attached vessel recapitulation, provides that all other terms and/or conditions not stated therein are to be governed by the parties Gencon charter party, which provides, in Rider Clause 43, that any disputes arising thereunder shall be according to English law and referred to mediation. However, in accordance with the charter party, if mediation is rejected by one of the parties, then any disputes shall be submitted to arbitration in London, England. Plaintiff has rejected mediation and has elected to have the dispute resolved by London arbitration. A copy of the Gencon charter party is attached hereto as Exhibit "E" and incorporated by reference herein.

21.    Plaintiff specifically reserves the right to arbitrate the substantive matters in dispute pursuant to the aforementioned arbitration provision.

22.    In addition to an attachment in the full amount of the claims as outlined above, Plaintiff also seeks attachment over an additional sum to cover its anticipated attorneys' fees, costs and interest, all of which are recoverable in London arbitration.

23.    Plaintiff estimates that it will take approximately two years before an arbitration award is likely to be rendered in the instant action. As a result of the global economic downturn, arbitrators have recently faced substantial increases in defaults and Rule B applications, which has resulted in a backlog of arbitration proceedings and will substantially delay the time before any hearing in this matter will commence. Once hearings are concluded, it is not unusual for a further period of up to six months to pass before the tribunal publishes its award. Based upon the foregoing, Plaintiff believes that the two year estimate is a reasonable calculation.

24.    Given this time frame, Plaintiff estimates, as nearly as can be computed, these additional damages/costs to be US $401,012.65, comprised of interest in the sum of US $95,762.65 (computed on the principal amount sought at a rate of four percent (4%) for a period of two years); US $222,700.00 in estimated U.K. counsel and solicitor fees; and US $82,500.00 in estimated arbitrators' fees, which will be incurred in conjunction with the London arbitration, and which are recoverable under English law.

25.    Based upon the foregoing, the sum total sought to be attached in this action is US $1,556,774.91, consisting of Plaintiff's principal claims of US $1,155,762.26, interest of US $95,762.65 and recoverable legal fees and costs in the London arbitration of US $305,250.00.

26.    The Contract of Affreightment in this case requires payment due Plaintiff to be made in U.S. Dollars. This requirement is consistent with the common practice in the worldwide vessel chartering business for payments to be made in U.S. Dollars.

27.    Defendant is believed to be currently engaged in the active chartering of vessels from South Africa and upon information and belief, as provided by Plaintiff's English solicitors, Defendant is likely to be shipping such a cargo in the coming months.

28.    Any payment by Defendant of charter hire or other sums to a non-domestic entity, or any payment by a non-domestic entity to Defendant, made in U.S. Dollars and effected by international electronic funds transfer, will almost certainly pass through an intermediary bank, or banks, primarily in New York City. The Clearing House Interbank Payment System ("CHIPS") represents that it processes approximately 95% of all such transfers.

29.    On the basis of the foregoing, Plaintiff submits that one or more electronic funds transfers in U.S. Dollars will be made from, or to, Defendant, and will be routed through an intermediary bank or banks in New York City, within the next month or months and will be subject to attachment by Process of Maritime Attachment and Garnishment issued pursuant to Supplemental Rule B.

30.    The named garnishee banks participate in the CHIPS system in New York to send U.S. Dollar wire transfers between banks in the United States and throughout the world.

31.    Upon information and belief, and after investigation, Defendant cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, but Plaintiff avers, on information and belief, that Defendant has, or will have during the pendency of this action, assets within this District comprising, *inter alia*, cash, funds, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, or any other tangible or intangible property, of, belonging to, due, claimed by or being held by or for the benefit of Defendant (hereinafter "assets"), located at, moving through, or held by, any garnishee(s) located within this District, including but not limited to HSBC (USA) Bank; Bank of America N.A.; The Bank of New York Mellon; Citibank N.A.; JPMorganChase Bank; Standard Chartered Bank; Wachovia Bank N.A.; Deutsche Bank AG; Barclays Bank PLC; UBS A.G.; Credit Suisse; Nordea Bank Finland PLC; Fortis Bank SA/NV; ABN-AMRO Bank N.V.; American Express Bank Ltd.; Bank of China, Royal Bank of Scotland, and/or others.

32.    Plaintiff respectfully requests that this Honorable Court retain jurisdiction over this matter, pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. § 201 *et seq.*, in the event it is necessary to seek further order of this Court in respect of the London arbitration proceeding between the parties and/or the confirmation and enforcement of any awards issued therein.

**WHEREFORE**, Plaintiff, SOUTHERN CHARTERING (PTY.) LIMITED, prays:

a.    That process in due form of law according to the practice of this Court may issue against Defendant, SAMCHROME LTD., citing it to appear and answer the foregoing, and failing such appearance and answer, to have judgment by default against the Defendant in the principal amount of the claim, plus interest, costs and recoverable attorneys' fees and costs;

b.    That if Defendant cannot be found within this District pursuant to Supplemental Rule B, that all assets of Defendant, up to and including the sum of US $1,556,774.91, may be restrained and attached, including but not limited to any cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or other assets of, belonging to, due, or for the benefit of, Defendants, including but not limited to such assets as may be held, received or transferred in their own name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking institutions including but not limited to HSBC (USA) Bank, Bank of America, The Bank of New York Mellon, Citibank N.A., JPMorganChase Bank, Standard Chartered Bank, Wachovia Bank N.A., Deutsche Bank AG, Barclays Bank PLC, UBS A.G., Credit Suisse, Nordea Bank Finland PLC, Fortis Bank SA/NV, ABN-AMRO Bank N.V., American Express Bank Ltd., Bank of China, Royal Bank of Scotland and/or any other garnishees(s) upon whom a copy of the Process of Maritime Attachment and Garnishment issued in this action may be served;

c.    That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary in order to give effect to the London arbitration; and

d.    For such other, further and different relief as this Court may deem just and proper in the circumstances.

Dated:  July 28, 2009

                                               **LAW OFFICES OF SIMON HARTER, ESQ.**
Attorneys for Plaintiff,
SOUTHERN CHARTERING (PTY.) LIMITED

By:

Simon Harter (SH-8540)
304 Park Avenue South – 11th Floor
New York, New York 10010
(212) 979-0250 (Phone)
(212) 979-0251 (Fax)

## **ATTORNEY VERIFICATION**

STATE OF NEW YORK        )
                                    ) ss.:
COUNTY OF NEW YORK    )

        **SIMON HARTER** verifies the following pursuant to 28 U.S.C. §1746:

        1.      I am a member of the Law Offices of Simon Harter, Esq., Attorneys for Plaintiff, SOUTHERN CHARTERING (PTY.) LIMITED, in this action and a Member of the Bar of this Honorable Court. I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

        2.      The sources of my information and the grounds for my belief are communications, information, and documentation provided by the Plaintiff and/or its duly authorized agents.

        3.      The reason this Verification is made by an attorney and not the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

        I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 28th day of July, 2009.


_____
Simon Harter (SH-8540)
Law Offices of Simon Harter, Esq.
304 Park Avenue South – 11th Floor
New York, New York 10010
(212) 979-0250 - Phone
(212) 979-0251 - Fax

# EXHIBIT "A"

Msg.From..: [NBL@mur.co.za]
Msg.Subj..: Ntabeni - COA - recap
Msg.Recvd.: 18-Sep-2007 11:25

---

**TO..** : "JH Maritime Ltd." (and others)
**FROM:** Southern Chartering
**DATE:** 18-SEP-2007 11:23
**MSG.** : 702470

---

*Recipients:*
TO: JH Maritime Ltd.
CC: chartering@southerns.com

---

Dear Andrew,

Many thanks for this, I think it is fair to say we both put a lot of hard work into this which is much appreciated.
All clean from my side.

rgds
Neil

---

> ======= *Original Message* ======= <
NEIL

FURTHER OUR NEGOTIATIONS AND HAVING DISCUSSED WITH CHTRS WE CAN ACCEPT FOLLOWING
WHICH I HOPE IS IN LINE WITH YOUR LAST:

"NTABENI" OR SUB

MV NTABENI, PAN FLAG, BLT 1983, TWN DKR, NO CENTERLINE BULKHEADS.
36677.5 SDWT ON 11.53
GT/NT   25005 / 10741 MTS
LOA/BM  182.5 / 29.5 M
5 HOHA, BUT NO 3 PERM FIITED WITH PITCH TANK AND CAN NOT BE USED FOR ANY OTHER CARGOES.
4X25 MTS CRANES, 1X35 MT CRANE, MIN OUTREACH 11M
HATCHES NO 1) 19.6X20.5M
    NO 2,4 +5) 19.55 X 10.4 X 2
VESSEL TO REMAIN FULLY CLASSED 100 A1 OR EQUIV FOR THE DURATION OF THIS CONTRACT
VESSEL TO REMAIN IN FULL CLASS WITH BONE FIDE P & I CLUB
ANY EXTRA INSURANCE DUE TO VESSEL EXCEEDING 20 YRS OLD TO BE FOR OWNERS ACCT TO MAX
USD7,000 PER SAILING
AND SAME DEDUCTIBLE FROM FREIGHT.
VESSELS TO BE ITF (OR EQUIVALENT)/DOC/ISM COMPLIANT/FITTED
OWNERS GUARANTEE VESSEL FULLY SUITABLE TO PERFORM THIS TRADE AND ENTER/LOAD AND
DISCHARGE AT THE RESPECTIVE LOAD AND DISCHARGE PORTS. VESSEL MUST HAVE MIN. 15 TON
CRANES, FULLY SERVICEABLE AND CAPABLE OF LOADING RESP. DISCHARGING CHARTERED CARGO

OWNERS: SOUTHERN CHARTERING LTD, JO'BURG SOUTH AFRICA
CHTRS:   SAMCHROME LTD , MALTA

FOR A CONTRACT OF AFFREIGHTMENT 6-7 CARGOES AT CHOPT EACH 33,000 MT 5 PCT MOLOO BULK
CHROME ORE AND/OR CHROME ALLOY IN 1 OR MORE GRADES AT CHOPT AS FULL OR PART CARGO AT
OWNERS OPTION – IN THE CASE OF CHROME ALLOYS A MAX 3 GRADES ARE APPLICABLE
EACH GRADE TO BE GIVEN SEPARATE HOLD STOWAGE HOWEVER IF THIS IS NOT POSSIBLE DUE TO
TONNAGES REQUIRED TO BE SHIPPED BY CHARTERERS THEN OWNERS ALLOWED TO SEPARATE BY
MEANS OF ARTIFICIAL SEPARATIONS (STEEL PLATES) ERECTED AND REMOVED AT OWNERS TIME RISK

Tuesday, September 18, 2007 14:35:56 PM

AND EXPENSE.
1-2 B RICHARDS BAY OR RB AND MAPUTO OR 1SB MAPUTO AT CHOPT/1 B LIANYUNGANG CHOPT
LIANYUNGANG AND POHANG
OWNERS TO SATISFY THEMSELVES AS TO NOMINATED VESSELS SUITABILITY FOR DRAFT AND
RESTRICTIONS ALL PORTS.

SHIPMENTS OVER THE APPROX PERIOD JUNE 2008 TO DEC 2009 TO SUIT WITH VESSELS IN BOUND
SCHEDULE WITH CURRENT INTENTION:

15/30 JUNE 2008
15/30 SEPT 2008
15/30 DEC  2008
15/30 MAR  2009
15/30 JUNE 2009
15/30 OCT 2009
IF PROGRAM DELIVERS EARLIER THAN ABOVE SCHEDULE WHICH ALLOWS AN ADDITIONAL SAILING
BEFORE THE END OF 2009 THEN SAME CAN BE DECLARED BY CHTRS AS THE OPTIONAL CARGO.

OWNERS TO GIVE CHARTERERS  MIN 40 DAYS NOTICE PRIOR TO 1ST DAY OF LAYCAN AND AT THAT
TIME EACH LAYCAN TO BE SET TO A 10 DAY SPREAD. THEREAFTER OWNERS TO GIVE CHTRS MIN 20
DAYS, 10/7/5/3/2 AND 1 DAY NOTICE OF ARRIVAL AT LOAD PORT.

COP-CQD BENDS. VESSEL TO BE LOADED AND DISCHARGED ON CUSTOMARY QUICK DESPATCH BASIS
BY STEVEDORES WHEREBY NO DEMURRAGE, DESPATCH OR DAMAGES FOR DETENTION WILL APPLY.
WITH THE EXCEPTION IF VESSEL IS NOMINATED AND LOADS AT THE BELT BERTH AT RICHARDS BAY
THEN THE FOLLOWING CONDITIONS APPLY:

THE CARGO TO BE LOADED, STOWED AND TRIMMED BY CHARTERER'S/SHIPPERS STEVEDORES FREE OF
RISK AND EXPENSE TO THE OWNERS, TO MASTERS SATISFACTION AT THE AVERAGE RATE OF 6000 MT
PER WWD OF 24 CONSECUTIVE HOURS SUNDAYS AND LOCAL AND LEGAL HOLIDAYS INCLUDED, SUPER
HOLIDAYS EXCLUDED.
TIME FOR SUCH LOADING WILL COUNT AFTER TURN TIME OF 24 HOURS AFTER NOTICE OF READINESS
TENDERED UNLESS SOONER COMMENCED IN WHICH CASE HALF ACTUAL TIME USED IS TO COUNT.
NOTICE OF READINESS SHALL BE TENDERED IN WRITING BY FAX/TELEX OR EMAIL BY MASTER OR
OWNERS AGENTS ANY TIME DAY AND NIGHT, SUNDAYS AND HOLIDAYS INCLUDED AFTER THE VESSEL
HAS BEEN DECLARED BY MASTER IN ALL RESPECTS READY TO COMMENCE LOADING OPERATIONS,
WHETHER IN BERTH OR NOT, WHETHER IN PORT OR NOT (IF VESSEL DUE TO LOCAL PORT
REGULATIONS OR PORT CONGESTION HAVE TO ANCHOR OUTSIDE OF PORT LIMITS). BEFORE
TENDERING NOTICE OF READINESS VESSEL TO PRESENT AT LOAD PORT WITH CLEAN SWEPT HOLDS
AND ALSO RESIDUES FROM PREVIOUS CARGOES, AND/OR RUST SCALE TO BE REMOVED FROM
HATCHES AND HOLDS, INCLUDING OVERHEAD BEAMS. OWNERS AGREE THAT VESSEL'S HOLDS SHALL
BE THOROUGHLY CLEANED BEFORE PRESENTING TO SHIPPER'S SATISFACTION. CHARTERER HAS THE
PRIVILEGE TO HAVE A SURVEYOR ON BOARD TO SURVEY THE HOLDS AND CARGO CONDITIONS PRIOR
TO LOADING AND DISCHARGING. FURTHER VESSEL TO HAVE ALL HATCH BEAM REMOVED, DERRICKS
RAISED, AND CRANES SET AND READY FOR WORK IF REQUIRED AND PERMITTED BY PORT
REGULATIONS. FAILING SAME, CHARTERERS CAN REFUSE TO ACCEPT NOTICE OF READINESS
TENDERED.
SHOULD VESSEL'S HOLDS BE TURNED DOWN BY THE SURVEYOR PRIOR LOADING, THE HOLDS SHALL
BE CLEANED SOONEST POSSIBLE TO THE SURVEYORS SATISFACTION. LAYTIME TO STOP COUNTING
FROM TIME OF REJECTION UNTIL VESSEL PASSED.

WAR, WHETHER DECLARED OR NOT, CIVIL WAR, RIOTS AND REVOLUTIONS, ACTS OF SABOTAGE,
NATURAL DISASTERS SUCH AS VIOLENT STORMS, CYCLONES, EARTHQUAKES, FLOODS, DESTRUCTION
BY LIGHTENING, EXPLOSIONS, FIRES, DESTRUCTION OF MINING MACHINERY, AND OF ANY KIND OF
INSTALLATIONS, BOYCOTTS, STRIKES AND LOCK-OUTS OF ALL KINDS, GO-SLOWS, OCCUPATION OF
MINES AND PREMISES, WORK STOPPAGES WHETHER PARTIAL OR TOTAL, POLITICAL DISTURBANCES,
ACTS OF AUTHORITY, WHETHER LAWFUL OR UNLAWFUL, ACCIDENTS AND/OR BREAKDOWNS AT THE
MINES, AT SHIPPERS WORKS OR WHARF, PARTIAL OR TOTAL STOPPAGE ON RAILWAYS, RIVERS, OR
CANALS, INTERVENTION OF SANITARY, CUSTOMS, AND/OR OTHER CONSTITUTED AUTHORITIES,
EPIDEMICS, QUARANTINE, OR ANY OTHER CAUSES OR HINDRANCES WHATSOEVER BEYOND THE
CONTROL OF THE CHARTERER, SHIPPER OR SUPPLIERS OF CARGO, PREVENTING OR DELAYING THE

MINING, SUPPLYING, LOADING, DISCHARGING OR RECEIVING OF THE CARGO ARE EXCEPTED, AND TIME LOST AT ANY TIME BY REASON OF ALL OR ANY OF THE AFOREMENTIONED CAUSES SHALL NOT BE COMPUTED IN THE LOADING TIME OR AS DEMURRAGE.

FREIGHT:

USD51.50 PMT FIO BASIS RICHARDS BAY BELT BERTH (LOAD TERMS)/LIANYUNGANG FOR CHROME ORE
USD51.50 PMT FIO BASIS MAPUTO (CQD TERMS)/LIANYUNGANG FOR CHROME ORE
USD52.50 PMT FIO BASIS 2 BERTH LOAD AT RICHARDS BAY/LIANYUNGANG CHROME ORE
USD53.75 PMT FIO BASIS  RICHARDS BAY AND MAPUTO /LIANYUNGANG (TERMS AT BELT BERTH/CQD AT CRANE BERTH RB)
USD54.50 PMT FIO FOR CHROME ALLOY WHETHER LOADED AT MAPUTO OR R.BAY BASIS NO SEPARATIONS BEING REQUIRED BASIS 1/2 (BASIS COMBO ORE/BELT)
USD56.50 PMT FIO FOR CHROME ALLOY WHETHER LOADED AT MAPUTO OR R.BAY BASIS SEPARATIONS BEING REQUIRED BASIS 1/2 (BASIS COMBO ORE/BELT)
USD55.00 PMT FIO FOR CHROME ALLOY WHETHER LOADED AT MAPUTO OR R.BAY BASIS NO SEPARATIONS BEING REQUIRED BASIS 1/2 (BASIS COMBO ORE/CRANE)
USD53.00 PMT FIO FOR CHROME ALLOY WHETHER LOADED AT MAPUTO OR R.BAY BASIS SEPARATIONS BEING REQUIRED BASIS 1/2 (BASIS COMBO ORE/CRANE)

IN THE CASE OF COMBINATION OF CHROME ORE/ALLOY THEN CHROME ALLOY SHIPMENT TO BE MIN 10,000 MT

FOR SHANGHAI AS AN ADDITIONAL PORT AND AFTER LIANYUNGANG IN VIEW OF DRAFT RESTRICTON 10.50 MTRS AN ADDITIONAL USD2.00 PMT OVER THE ENTIRE LOADED TONNAGE

CHOPT TO DECLARE OTHER MAIN CHINA PORTS INSTEAD OF LIANYUNGANG OR POHANG IN WHICH CASE:

FOR OTHER CHINESE PORTS AS AN ALTERNATIVE TO LIANYUNGANG TO BE SUBJECT TO OWNERS AGREEMENT AND SUITABILITY FOR RESTRICTIONS OF NTABENI OR OTHER NOMINATED VESSEL WHICH TO BE AT A RATE TO BE MUTUALLY AGREED AND CALCULATED BASIS THE BASE RATE PLUS OR MINUS ACTUAL ANTICIPATED ADDITIONAL COSTS.

FREIGHT TO BE FIO SPOUT/MACHINE TRIMMED, ANY ADDITIONAL TRIMMING A/O PAYLOADING REQUIRED BY MASTER TO BE FOR OWNERS ACCT.
FREIGHT PAYABLE 100 PCT W/I 7 BANKING DAYS AFTER SIGNING & RELEASE OF B'S/L AND RECEIPT OF OWNERS FREIGHT ACCOUNT TOGETHER WITH COPY B/L LESS COMMS.
FREIGHT DEEMED EARNED ON SHIPMENT DISCOUNTLESS AND NON-RETURNABLE SHIP A/O CARGO LOST OR NOT LOST
B'S/L TO BE MARKED "FREIGHT PAYABLE AS PER C/P". SHOULD HOWEVER "FREIGHT PREPAID" B'S/L BE REQUIRED THEN OWNERS TO RECEIVE 100PCT FREIGHT LESS COMMS
PRIOR RELEASE OF SUCH MARKED B'S/L.
OWNERS TO ISSUE AND RELEASE CLEAN ON BOARD B'S/L.
DEMURRAGE USD29,000 DHDLTS IN THE CASE LOAD TERMS ARE APPLICABLE
CHARTERERS LOAD PORT AGENTS IN SOUTH AFRICA TO BE AGREED.
OWNERS AGENTS IN CHINA - KENT SHIPPING
OWNERS AGENTS IN POHANG - SEWON ( THEY HAVE BEEN HANDLING THE PITCH LOADING FOR 10 YEARS)
2.50 PCT ADDCOM + 1.25 PCT JHM

ALL OTHER TERMS/CONDITIONS PER CHTRS GENCON C/P

ENDS

PLEASED TO HAVE YOUR RECONFIRMATION

MEANTIME MANY THANKS FOR YOUR COOPERATION AND CONTINUED SUPPORT WHICH IS GREATLY APPRECIATED.

KIND REGARDS

Tuesday, September 18, 2007 14:35:56 PM

ANDREW

**JH MARITIME LTD**
Tel: +44 1460 249306
Fax: + 44 1460 240182
Mobile: + 44 7876745339

email: chartering@jhmaritime.com

EXHIBIT "B"

```
Print For: nbl
Type.....: Email - Internet
Msg.Nr..: IN 4393087
Created..: 05-May-2009 17:02
From.....: <NBL@mur.co.za>
Subject..:
Comment..: Recvd: (CPID:4/SECS:0)
```

TO..: "JH Maritime Ltd." (and others)
FROM: MUR Shipping - Chartering
DATE: 05-MAY-2009 17:02
MSG.: 893930


Chartering Dept.

------- Recipients: ----------
TO: JH Maritime Ltd.
CC: rmm@murship.com
CC: bep@murship.com
CC: chartering@southerns.com
-------------------------------------

Dear Andrew,

Ntabeni.

Southern Chartering (PTY) Ltd and Samchrome Ltd, Malta, have not reached a
final agreement on an amended freight addendum to cover a possible relief
of the current COA, covering 2009 shipments.

Although a freight invoice has been raised, on the current voyage, at a lower
rate than the COA agreement, Southern Chartering(PTY) Ltd reserves its
rights to recover the full freight amount in the event of an agreement not
being reached.

Kind regards
Neil.

EXHIBIT "C"

```
Msg.From..: "JH Maritime" [chartering@jhmaritime.com]
Msg.Subj..: Ntabeni
Msg.To....:
Msg.CC....: "'Samchrome shipping'"
"'Pillay
Lawrence \(Richardsbay\)'"
Msg.Recvd.: 04-Jun-2009 10:23
```

Neil,

Further to the information you gave to us yesterday, regrettably Chtrs have lost trust.

Having given your 20 day notice with laycan thereby set to 9/19 June and you have now given notice that the vessel will now only arrive earliest 20th June, Chtrs are now within their rights to cancel this voyage.

It is clear from the previous voyage that the notices you give, albeit from information you may receive from a third party, cannot now be trusted. Chtrs have already spent more money in ensuring product arrives to port in time as well as having contractual agreements with their customers against known shipment positions with penalties that ensue from late delivery and bearing in mind the very costly disaster that befell the previous shipment, Chtrs have just had enough.

We are very sorry but Chtrs hereby cancel this voyage within the terms of the COA and without prejudice reserve all their rights to claim any additional or consequential damages or costs as a result of this situation.

Kind regards

Andrew

**JH MARITIME LTD**
Tel: +44 1460 249308
Fax: +44 1460 240182
Mobile: + 44 7876745339

email: chartering@jhmaritime.com

Thursday, June 04, 2009 16:05:12 PM

# EXHIBIT "D"

**Ntabeni – claim calculation for the cancelled June shipment**

- Richards Bay – Singaopre – Lianyungang/Pohang (8,442nm) = 28.14 days
- Laden speed, 12.5 knots, consumption 32mts IFO laden,1 mts MDO laden, 3mts MDO port working, 1.6mts IFO and 0.8mts MDO port working
- Bunker prices: USD357pmt IFO  &  USD480pmt MDO
- Estimated port times (total 12 days):
    - Richards Bay 6 days -  Singapore (for bunkers) 1 day -  Lianyungang/Pohang 5 days

| | | |
|---|---|---|
| **Freight Earned** | 34,000 mts x USD51.50 | **USD1,751,000** |
| **Less commission** | **USD65,662.50**<br><br>(3.75% x USD1,751,000) | |
| **Less IFO on laden voyage** | **USD321,471.36**<br><br>(900.48mts x USD357)<br>(28.14  x 32 = 900.48mts) | |
| **Less MDO on laden voyage** | **USD13,507.20**<br><br>(28.14mts x USD480)<br>(28.14 x 1 = 28.14mts) | |
| **Less MDO  consumed in port** | **USD17,280**<br><br>(36mts x USD480)<br>(12 days x 3mts) | |
| **Less loadport costs** | **USD30,000** | |
| **Less bunker port costs** | **USD1,734.43** | |
| **Less disport costs** | **USD45,000** | |
| **Less miscellaneous** | **USD10,000** | |
| **Hire costs** | **USD1,063,710**<br><br>40.14 x USD26,500 | |
| **Total costs** | **USD1,688,104.22** | |
| **Total profit** | | **USD62,895.78** |

**Mitigation calculation for the June voyage**

- Richards Bay – Singapore – Zhangijang – Busan – Pohang – estimated time 42 days 22 hours 33 minutes
- Vessel details as above
- Load port time: 0740 hrs LT (0540 hrs GMT) 19 June 2009 to 1646 hrs 24 June 2009 (5.379 days)
- Singapore arrival 2248 hrs GMT 11 July 2009 - departure 0900 hrs GMT 12 July 2009
- Zhanjiang arrival 0700 hrs LT 17 July 2009 – departure 0835 hrs LT 19 July 2009
- Taichung arrival 1306 hrs LT 21 July 2009 – departure 1800 hrs LT 23 July 2009
- Busan eta 1000 hrs LT 26 July 2009 – etd 30 July 2009
- Pohang eta 0000 hrs GMT 31 July 2009

| | | |
|---|---|---|
| **Freight Earned** | Chrome ore:<br>16,661mts x USD33pmt | **USD549,813** |
| **Freight Earned** | Pig iron:<br>17,600mts x USD37.50pmt | **USD660,000.00** |
| **Less commission** | **USD13,745.33**<br><br>(Chrome ore 2.5% x USD549,813) | |
| **Less commission** | **USD31,350.00**<br><br>(Pig iron 3.75% x USD660,000) | |
| **Less IFO on laden leg** | **USD426,417.12** | |
| **Less MDO on laden leg** | **USD4,827.94** | |
| **Less MDO consumed in port** | **USD22,320**<br><br>(48mts x 620)<br>(16 days x 3mts) | |
| **Less loadport costs** | **USD26,057.22** | |
| **Less bunker port costs** | **USD1,734.43** | |
| **Less disport costs** | **USD83,150.84** | |
| **Less miscellaneous** | **USD10,000** | |
| **Total costs** | **USD619,602.88** | |
| **Total hire** | **USD1,106,746**<br><br>41.764 days x USD26,500 daily hire for the Ntabeni | |
| **Hire + costs** | **USD1,726,348.88** | |
| **Total profit/loss** | **USD1,209,813.00 - USD1,726,348.88** | **(USD516,535.88)** |

**Summary**

Estimated profit from Charterers having performed the June shipment:    USD62,895.78

Loss from the mitigation voyage:    (USD516,535.88)

Charterers' cancellation of the June shipment resulted in Owners making a loss of **USD579,431.66**

EXHIBIT "E"

| 1. Shipbroker | RECOMMENDED |
|---|---|
| **JH MARITIME LTD**<br>**The Old Rectory**<br>**Great Lane, Shepton Beauchamp**<br>**Ilminster, Somerset TA19 0LJ**<br>**UK**<br><br>**Tel: +44 1460 249306**<br>**Fax: + 44 1460 240182**<br>**Mobile: + 44 7876745339**<br>**email: chartering@jhmaritime.com** | **THE BALTIC AND INTERNATIONAL MARITIME COUNCIL**<br>**UNIFORM GENERAL CHARTER (AS REVISED 1922, 1976 and 1994)**<br>(To be used for trades for which no specially approved form is in force)<br>**CODE NAME: "GENCON"**<br><br>Part I |

| 2. Place and Date |
|---|
| **ILMINSTER, 7th DECEMBER 2006** |

| 3. Owners/Place of business (Cl. 1) | 4. Charterers/Place of business (Cl. 1) |
|---|---|
| **Southern Chartering , Johannesburg** | **Samchrome Ltd , Malta** |

| 5. Vessel's name (Cl. 1) | 6. GT/NT (Cl. 1) |
|---|---|
| **Southern Chartering tonnage tbn  see also clause 45**<br>**Vessels nominated to be singledeck or tweendeck (open hatch type) with similar spec to that given earlier**<br>**25 yrs max, classed Lloyds 100 A1 or equiv. Fully P & I covered**<br>**Nominated vessels to be between 15/25,000 dwcc**<br>**Owners to satisfy themselves as to nominated vessels suitability for draft and restrictions at all ports** | |

| 7. DWT all told on summer load line in metric tons (abt.) (Cl. 1) | 8. Present position (Cl. 1) |
|---|---|
| | |

| 9. Expected ready to load (abt.) (Cl. 1) see clause 6 |
|---|
| |

| 10. Loading port or place (Cl. 1)<br>    **1sb Richards Bay** | 11. Discharging port or place (Cl. 1)<br><br>**Tokuyama abt 9/10,000 mt 1-2 grades chopt per shipment**<br>**Tobata    abt 3/7000 mt 2-3 grades chopt per shipment**<br>**Hikari    abt 4/5,000 mt lots 1-2 grades chopt per shipment**<br>**Kinuura   abt 2/3000 mt lots 1-2 grades chopt per shipment**<br>**Pohang        5/15,000 mt lots chopt per shipment**<br>**Each shipment to be 1 or 2 ports of discharge max at chopt out of any of the above discharge port options** |
|---|---|

| 12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo") (Cl. 1) see clause 47 |
|---|
| |

| 13. Freight rate (also state whether freight prepaid or payable on delivery) (Cl. 4)<br>    **Freight USD46.50 pmt fio skip loaded for Japan destined cargo**<br>**Freight USD36.00 pmt fio skip loaded for Pohang** | 14. Freight payment (state currency and method of payment; also beneficiary and bank account) (Cl. 4)<br><br>**see clause 4** |
|---|---|

| 15. State if vessel's cargo handling gear shall not be used (Cl. 5)<br><br>**ship to load a/o discharge with own gear** | 16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b). If total laytime for load. and disch., fill in c) only) (Cl. 6) |
|---|---|
| | a) Laytime for loading<br>    **COP-CQD** |
| 17. Shippers/Place of business (Cl. 6)<br>**Samancor Chrome, Richards Bay** | b) Laytime for discharging<br>    **COP-CQD** |
| 18. Agents (loading) (Cl. 6)<br><br>**Bay Shipping, Richards Bay** | c) Total Laytime for loading and discharging |



| | |
|---|---|
| 19. Agents (discharging) (Cl. 6)<br>    Owners nominated agents to be advised | |
| 20. Demurrage rate and manner payable (loading and discharging) (Cl. 7)<br><br>   No demurrage/despatch or damages for detention shall apply to this Charter Party | 21. Cancelling date (Cl. 9)<br><br>see box 9 |
| | 22. General Average to be adjusted at (Cl. 12)<br><br>London |
| 23. Freight Tax (state if for the Owners' account  (Cl. 13 (c))<br>  see clause 25 | 24. Brokerage commission and to whom payable (Cl. 15)<br><br>  2.50% address commission to Charterers<br>  1.25% brokerage to JH Maritime Ltd<br>  both deductible from freight |
| 25. Law and Arbitration (state 19(a), 19(b) or 19(c) of Cl. 19; if 19 (c) agreed<br>        also state Place of Arbitration) (if not filled in 19 (a) shall apply) (Cl. 19)<br>                             see clause 43 | |
|     (a)   State maximum amount for small claims/shortened arbitration (Cl. 19)<br><br>US$75,000 | 26. Additional clauses covering special provisions, if agreed<br>    Rider clauses 1 to 48 as attached are deemed to be<br>incorporated into theis C/P |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter Party which shall include Part I as well as **additional rider clauses 1 to 48 per attached** Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of **the rider clauses** Part II to the extent of such conflict.

| Signature (Owners) | Signature (Charterers)<br>By Charterers Authority<br>for and on behalf of<br>JH Maritime Ltd<br><br>As Agents |
|---|---|

Copyright, published by The Balltic and International Maritime Council (BIMCO), Copenhagen

**JH Maritime Ltd**                                                 7th **December 2006**

**Southern Chartering Tonnage TBN**

1.   It is this day mutually agreed between the party mentioned in Box 2 as Owner/Disponent Owner/ Time Charter Owner (hereinafter called Owner) of the Vessel named in Box 3, classed Lloyds + 100 AI (or equivalent at a classification society that is a member or the International Association of Classification Societies), described in Box 5&6 and further detailed per Appendix A and the party mentioned in Box 4 as Charterer that

2.   The said Vessel being warranted tight, staunch, strong and in every way fitted for the voyage, shall after delivery of her previous cargo, proceed with all convenient speed to the loading port(s) or place(s) stated in Box 10 and there load always afloat as directed by Charterer or its designated representatives, cargo as stated in Box 12, not exceeding what she can reasonably stow and carry and being so loaded, shall with all convenient speed  proceed to the discharging port(s) or place(s) stated in Box 11 and there delivery the cargo, always afloat as directed by Charterer or their designated representatives.
Cargo is always to be loaded, carried and discharged in accordance with the rules and requirements of IMO

3.   **Freight Rate**
Freight, inclusive of all port charges, pilotages, light dues and all other dues usually paid by Vessel, shall be paid at the rate stated in Box 13.

4.   **Freight Payment**
Charterer shall pay freight on Bill of Lading weight in United States Dollars to Owner's account 100 percent of Bill of Lading quantity shall be paid within Five (5) banking days of signing and releasing freight prepaid/ freight payable as per contract, at Charterer's Option. Bills of Lading. Discountless and non-returnable whether vessel and/or cargo is lost or not lost. However if bills are marked "freight prepaid" then owners to hold the bills of ladings until they confirm receipt of 100% freight remittance from Charterers.

     Owners Bankers:

5.   **Bills of Lading**
The Master shall authorise the agents at load port to sign and release on his behalf three negotiable Bills of Lading or non negotiable Seaway Bills if requested by Charterer, at any time Charterer's or Shipper's request this for any quantity loaded up to that time. Shippers' weights in accordance with the shore scales/tally/weighbridge/draft survey (in Charterer's exclusive option) at the loading port shall be accepted as tonnage shipped and Mate's receipts shall be drawn up accordingly. Bills of Lading or Seaway Bills are always to be drawn up in conformity with the Mate's Receipts. Upon completion of loading Owner shall release three negotiable Bills of Lading or non negotiable Seaway Bills, claused "Freight Prepaid" or at Charterer's option "Freight Payable as per Contract", to Shippers or their representatives.
The Carriers Bill of Lading Congen 94 is to be to be used for all cargo.
Clean on Board Bills of Lading to always be issued.

6.   **Laydays /Cancellation and Notices**
Charterers to give 60 days advance notice of actual shipping requirement for each respective month. Owners to provide a 30 day approx schedule and vessels likely availability loadreadiness to a 10 day spread of laycan.
Owners to provide furthermore a 12 day definite notice, thereafter 7,5,3,2 & 1 day notice.
Charterers to guarantee a min of 12 monthly shipments throughout 2007
Charterer shall have the right to cancel this Contract or at its option the voyage in question should there be any material misrepresentation made by Owner in respect of the Vessel's particulars, the Vessel's suitability to perform the voyage, the Vessel's position and/or itinerary or should the Vessel not have tendered Notice of Readiness in accordance with Clause 10 on or before the "Laycan Cancelling" as per Box 10.

- 1 -

**JH Maritime Ltd**                                           7th **December 2006**

**Southern Chartering Tonnage TBN**

7. **Loading/Discharging Terms**
The cargo shall be loaded/discharged in accordance with Box 13 .
In the event that ship's gear breaks down any craneage employed in loading to be for Owners account.

8. **Notice of Readiness**
At load port, Owner/Master are not to tender, nor is Charterer obliged to accept, Vessel's NOR prior to commencement of laycan, unless otherwise previously agreed.

9. **Shifting Cost and Time**
If more than one berth or anchorage at any loading and discharging port has been agreed, shifting costs including bunkers consumed shall be for Owner's account. Time so used shall not count as laytime or time on demurrage.

10. **Warping**
The Vessel shall move along any one berth or installation, as reasonably required by Charterer or Terminal Operator, solely for the purpose of making any hatch or hatches available to the loading or discharging facilities at the berth or installation. All costs onboard the Vessel including bunkers shall be for Owner's account.

11. **Demurrage and Despatch**
As per Box 20

12. **Overtime**
All overtime expenses at loading and discharging port(s) shall be for account of the party ordering the overtime. If overtime is ordered by port authorities or the party controlling the loading or discharging terminal or facility, such expenses shall be shared between Owners and Charterers equally. Overtime expenses for the Vessel's officers and crew shall always be for Owner's account.

13. **Stevedoring**
The cargo shall be loaded, spout/dump/machine trimmed and discharged free of risk to the Vessel and to the Master's satisfaction in respect of seaworthiness. Stevedores at loading and discharging ports are to be appointed and paid for by Shipper(s), Receiver(s) or Charterer and shall work under the supervision of the Master.
Owners are to provide separation between different grades of ferroalloys. The supply, erection and removal of these separations and any payloading required are to be at Owners time risk and expense. Charterers cargo at all times to be completely separated from any other cargo loaded on board. The costs and risk of these separations are always for Owners account.
If it is required by the custom of the port, the Vessel's crew shall operate free of expense to Charterer the Vessel's cargo gear, to load and unload mechanical equipment used in bulk cargo operations. If Charterer requires it and local regulations permit, crew are to carry out cargo handling operations.

14. **Lighterage**
Charterer has the option to load from barges sent alongside and/or discharge into barges sent alongside. Lighterage, if any, shall be at Charterer's risk and expense, including such fendering necessary the safe operations.

15. **Hold Cleanliness**
At the loading port(s) the Vessel's holds shall be suitable in all respects (which shall include a gas-free certificate if the Vessel is a combination carrier) to receive the cargo to be loaded under this Contract to the satisfaction of an independent surveyor and/or such recognised local authority as the regulations or Shippers may require. If the Vessel's holds are found to be unsuitable, any time lost until the Vessel is accepted and is ready in all respects as if the Vessel has not originally been rejected to load, shall not count as laytime or as time on demurrage. Any expenses directly attributable thereto including but not limited to standby of trucks, labour and mechanical equipment shall be for Owner's account.

- 2 -

**JH Maritime Ltd**                                                  7th December 2006
**Southern Chartering Tonnage TBN**

16.    **Hold Accessibility**
       Vessel's holds and tank tops shall be suitable for the utilisation of grabs and any other mechanical equipment used in loading and discharging operations. No cargo shall be loaded in any space which is inaccessible or unsuitable for such equipment.

17.    **Lighting**
       The Vessel shall give, free of expense to Charterer, full use of her lighting on deck and in the cargo compartments which shall be adequate for all cargo operations.

18.    **Trading Certificates**
       Owner undertakes as a condition that throughout the term of this Contract the Vessel shall be in all respects eligible under applicable conventions, laws and regulations for trading to the ports and places as specified in this Contract and that at all times the vessel shall have on board for inspection by the appropriate authorities all certificates, records, compliance letters and other documents required for such services, including but not limited to certificates of financial responsibility for pollution.

19.    **International & Local Regulations**
       The Vessel shall comply with all applicable international and local laws and regulations, at any port of call under this Charter Party. All time lost by reason of the relevant authority declaring the Vessel to be in non-compliance with any of the afore mentioned shall not count as laytime or as time on demurrage and any expenses directly attributable thereto including but not limited to standby of trucks, labour and mechanical equipment shall be for Owner's account.

20.    **Restrictions, Routeing & Rotation**.
       The Vessel shall proceed to the first or sole discharging port via the most direct route unless otherwise agreed. Loading and discharging port(s) rotation shall be in Owner's Option, unless otherwise agreed.
       Prior to arrival at loading and discharging port(s) Omer and Master to he solely responsible to determine the applicable size, draft, length, beam and air draft limitations and any other restrictions.

21.    **Transfer**
       Charterer shall have the privilege of transferring part or whole of this Contract to others, guaranteeing to Owner due fulfilment of this Contract.

22.    **Non-presentation of Bills of Lading**
       If requested by Charterer, the Master shall release all or part of the cargo at the discharging port(s) without presentation of original Bills of Lading. Prior to discharge Charterer shall provide Owner a Letter of Indemnity as per the Owner's P & I club form but without a bank guarantee. Such Letter of Indemnity shall automatically become null and void and to be promptly returned to Charterer upon presentation of the original Bill of Lading to Owner or Master.

22.    **ITF and Boycott**
       Owner undertakes as a condition that the present terms and conditions of employment of the crew comply with an ITF Agreement or a bona fide Trade Union Agreement that is acceptable to the ITF and their representatives and will remain so for the duration of this Contract. In the event of loss of time and/or extra expenses incurred due to boycott of the Vessel (whether actual or threatened) and/or dispute with labour because of the Vessel's flag or nationality of the Owner, Master, Officers or Crew are employed, such time shall neither count as laytime nor time on demurrage and such extra expenses shall be for Owner's account.

- 3 -

**JH Maritime Ltd**                                          7th December 2006

23.    **Strike Clause**

Time lost in loading and/or discharging by reason of any of the following causes shall neither count as laytime nor time on demurrage: strikes, lockouts or stoppages of personnel connected with mining, production, port or facility services or any Transport and/or handling of the cargo whether inland or at the port or facility. Furthermore, Charterer, Shipper(s) and/or Receiver(s) shall not be liable or otherwise responsible for delays in loading and/or discharging the Vessel if prevented by any of the foregoing causes.

If there is a strike, lockout or stoppage, as defined above, at the loading port or facility prior to the Vessel's arrival there, the Owner may request from Charterer a declaration as to whether Charterer agrees to maintain the voyage calculating laytime as if there were no strike, lockout or stoppages. If Charterer has not made such a declaration within 48 hours (excluding weekends) of such request, Owner then has the option of cancelling the voyage without any liability to Owner or Charterer. Owner shall have the liberty to sail from a loading port or loading facility affected by strike, lockout or stoppage as defined above, without the cargo or sail with any cargo forming part of the intended shipment on expiry of 48 hours' notice of Owner's intention to do so which in any case shall not be declared by Owner until at least 72 hours have elapsed since the Vessel's arrival at or oft the port or facility so affected. Owner's 48-hour notice shall be invalidated by the cessation of the strike, lockout or stoppage within this notice period. if the Vessel sails with part of the intended shipment Charterer shall pay freight only on the cargo quantity actually loaded and Owner shall have liberty to complete with other cargo en-route for their own account.

24.    **Force Majeure**

Subject to ice clause 55, Owner shall not be liable to Charterer, nor will Charterer be liable to Owner, for any delay or failure in the performance of obligations hereunder, if snch failure or delay is due to or results from an act of war or the anticipated imminence thereof; restraints of rulers, governments, or people; act of terrorism; legislation, decrees, orders, regulations or the like in the country of origin or of vessel's flag; blockade, sanctions, civil commotion, political disturbances, breakdowns, accidents, or stoppages whether total or partial, at ports, on railways, or other means of transport to or from the ports; epidemics; quarantine; Act of God; weather (including drought, fog, frosts, floods, snow, storms, tempest or washaways) or any other event of occurrence of any nature or kind whatsoever beyond the reasonable control of Owner and/or Charterer or, in connection with Charterer, any financial impecuniosities of Charterer's intended buyers or other related default(s), in circumstances where, if relevant, alternative cargo(es) are not (in Charterer's discretion) commercially attainable.

The party whose performance of any obligation is directly affected, or who has reason to believe such performance maybe affected, by reason of any of the causes referred to above shall, as promptly as possible, give notice thereof to the other party concerned in writing, and shall also within ten (10) days thereafter notify the other parry concerned, in writing, of particulars of the relevant event and supply supporting evidence.

Should any of the circumstances detailed above lead to delays up to fifteen (15) days in duration, for any of the contracted cargo(es), then either Charterer or Owner, shall take reasonable steps to make good and resume with the least possible delay, compliant with their obligations under this Contract.

Should any of the circumstances detailed above lead to delays in excess of fifteen (15) days, for any of the contracted cargo(es), then either Charterer or Owner, shall have the right to cancel this Contract with fifteen (15) days written notice, without liability to either party; alternatively by mutual agreement, this Contract shall be suspended for the period so affected and Owner and Charterer shall negotiate and so decide whether terms of this Contract shall be extended beyond the original term by the period of suspension hereof.

If the cumulative Force Majeure events in any contract year total more than thirty (30) days, Charterer shall have the right to reduce the contractual number of shipments to be performed in that contractual year.

25.    **Taxes and Dues**

Owner shall pay all dues, charges and taxes customarily levied on the Vessel including any income or freight tax applicable at loading port(s) or country, howsoever the amount thereof may be assessed, as well as taxes levied on the freight. Charterer shall pay all dues, charges, duties and taxes customarily levied on the cargo, howsoever the amount thereof may be assessed. Owner shall pay all canal, lock, seaway and any other river or waterway tolls, dues and charges, howsoever the amount thereof is assessed.

**JH Maritime Ltd**                                    7th December 2006

Southern Chartering Tonnage TBN

26.  **Extra Insurance**
Extra insurance on the Vessel and/or cargo on account of the Vessel's ownership, flag, classification, or age above 25 years to be for
Owner's account. Charterer may elect to deduct extra insurance on the cargo from payment of freight.

27.  **Stevedore damage**
At loading and discharging ports, any stevedore damage to the ship shall be settled between Owner and Stevedore(s). However, Charterer shall render all reasonable assistance to Owner in the pursuit of their claim against the Stevedores for settlement of damage to the Vessel caused by the Stevedore(s).

28.  **Deviation**
The Vessel shall have the liberty to deviate for the purpose of saving life or property, with leave to sail without pilots, tow or to be towed and assist Vessels or to be assisted. Salvage shall be for Owner's sole benefit.

29.  **Bunkering**
The Vessel shall have liberty as part of the contract voyage to proceed to any port or ports at which fuel is available for the purpose of bunkering at any stage of the voyage whatsoever and whether such ports are on or off the direct and/or customary route or routes between any of the loading or discharging ports named in this Contract, and may there take fuel in any quantity in the discretion of Owner even to the full capacity of the fuel tanks and deep tanks or any other compartment in which fuel can be carried, whether such amount is required or is not for the chartered voyage.

30.  **Lien & Cesser**
All liability of Charterer shall cease on completion of loading except for payment of freight, deadfreight .
Owner has a lien on cargo for freight, deadfreight.

31.  **Protection & Indemnity (P&I) Cover and Hull & Machinery insurance.**
Owner undertakes as a condition that the Vessel is entered with a P&I Club for full coverage and that the Vessel's hull and machinery is fully insured and shall remain so for the duration of the Charter.

32.  **Pollution Indemnity**
Owner agrees to indemnify Charterer, their agents, or any other party against any liabilities which may be imposed on them or which they may incur under any statute regarding liability for pollution of waters by oil or other substances, by reason of any contravention of such statute by the Vessel, the Master or any servant or agent of Owner provided that such contravention shall not have been caused or contributed to by the party seeking to be indemnified under this Contract. Owner warrants that the Vessel is entered in a P& I Club with cover for liabilities arising out of any contravention as aforesaid. L.aytime shall not count nor shall demurrage accrue for any time lost through non-conformity with the above.

33.  **Bimco ISM Clause**
Owner shall procure that both the Vessel and "the Company" (as defined by the International Safety Management Code (ISMCode) shall comply fully with the requirements of the ISM Code where applicable during the currency of this Contract. Upon request the Owner shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to Charterer.
Except as otherwise provided in this Contract, loss, damage, expense or delay caused by failure on the part of Owner or "the Company" to comply with the ISM Code shall be for Owner's account.

34.  **ISPS Clause for Voyage Charter Parties**
(a) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant
to the Vessel, the Owners shall procure that both the Vessel and "the Company ('as defined by the ISPS Code) shall comply with. the requirements of the ISPS Code relating to the Vessel and "the Company"- Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).
(ii) Except as otherwise provided in this Charter .Part, loss, damage, expense or delay, excluding consequential

- 5 -

JH Maritime Ltd                                          7th December 2006

## Southern Chartering Tonnage TBN

loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b) (i) The Charterers shall. provide the CSO and the Ship Security Officer (SS0)/Master with their full style, contact details and any other information the Owners require to comply with the ISPS Code.

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account and any delay caused by such failure shall be compensated at the demurrage rate.

(c) Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code, the following shall apply;

(i) Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code.

(ii) Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code shall count as laytime or time on demurrage if the Vessel is on laytime or demurrage. If the delay occurs before laytime has started or after laytime or time on demurrage has ceased to count, it shall be compensated by the Chatterers at the demurrage rate.

(d) Notwithstanding anything to the contrary provided in this Charter Party, any additional costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility Cr any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(e) if either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

35.  **U.S. Customs Advance Notification/AIS Clause for Voyage Charter Parties**

(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Owners shall comply with the current U.S Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i) Have in place a SCAC (Standard Carrier Alpha Code);

ii) Have in place an ICH (international Carrier Bond); and

iii) Submit a cargo declaration by A.M.S (Automated Manifest System) to the US Customs,

(b) The Charterers shall provide all, necessary information to the Owners and/or their agents to enable the Owners to submit a timely and accurate cargo declaration.

'the Charterers shall assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the 'provisions of this subclause. Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, all time used or lost shall count as laytime or, if the Vessel is already on demurrage, time on demurrage.

(c) The Owners shall assume liability for and shall indemnify, defend and hold harmless the Charterers against any loss and/or damage whatsoever (including consequential loss and/or damage) and any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Owners' failure to comply with any of the provisions of sub-clause (a). Should such 'failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, all time used or lost shall not count as laytime or, if the Vessel is already on demurrage, time on demurrage.

(d) The assumption of' the role of carrier by the Owners pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

36.  **Protective Clauses**

Clauses 37 to 40 shall also be deemed to be incorporated into this Contract and all Bills of Lading issued hereunder.

**JH Maritime Ltd**                                    7th December 2006
**Southern Chartering Tonnage TBN**

37.   **Clause Paramount**

"This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, the Hague Rules, the Hague-Visby Rules or the Hamburg Rules, as compulsorily applicable, or such other similar national legislation as may apply by virtue of origin or destination of the Bills of Lading, which shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said applicable Act. If any term of this Bill of Lading be repugnant to said applicable Act to any extent, such term shall be void to that extent, but no further."

38.   **Both to Blame Collision**

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.
The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

39.   **New Jason**

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods. shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods.
If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.

40.   **"Voywar93" Clause**

(I) For the purpose of this Clause, the words:
(a) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and
(b) "War Risks" Shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.
(2) If at any time before the Vessel commences loading, it appears that, in the reasonable judgment of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks; provided always that if this Contract or Carriage provides that loading or discharging is to take place within a. range of ports, and at the port or ports nominated by the Charterers the Vessel, her cargo, crew, or other persons onboard the Vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt o[notice of such requirement.

- 7 -

**JH Maritime Ltd**                                                    7th December 2006
Southern Chartering Tonnage TBN

(3) The Owners shall not 'be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereat or to proceed through any canal or water-way, or IC proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and/or the Owners, the Vessel, 'her cargo (or any pan thereof, crew or other persons on board the Vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If it should so appeal, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and il'within48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) 'in complete fulfilment of the Contract of Carriage. The Owners shall 'be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds l00 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.

(4) If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part o the route (including any canal or waterway) which is normally and customarily used 'in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. in this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.

(5) The Vessel shall have liberty:
 (a) to comply with, all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions;

(b) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who ale charged with their enforcement;

(d) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(e) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to 'internment, imprisonment or other sanctions;

(f) where cargo has not been.loaded or has been. discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in. a contrary direction to the ordinary or customary route.

(6) If in compliance with any of the provisions of sub-clauses (2) to (5) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the Contract of Carriage.

41.   **General Average**
      Any General Average occurring under this Contract is to be adjusted, stated and settled in London according to York-Antwerp Rules, 1994 and any subsequent amendments thereto, according to English law and practice.

- 8 -

**JH Maritime Ltd**                                                    7th **December 2006**
**Southern Chartering Tonnage TBN**

42.   **Ice Clause**
The Vessel shall not be obliged to force ice but, subject to the Owners' approval and having due regard to its
size, construction and class, may follow ice-breakers when reasonably required.
(a) Port of Loading
(i) If at any time after setting out on the approach voyage the Vessel's passage is impeded by ice, or upon
arrival the leading port is inaccessible by reason of ice, the Master or Owners shall notify the Charterers thereof
and request them to nominate a safe and accessible alternative port.
If the Charterers fail within 48 running hours, Sundays and holidays included, to make such nomination or
agree to reckon laytime as if the port named in the contract were accessible or declare that they cancel the
Charter Party, the Owners shall have the option of cancelling the Charter Party.
(ii) If at any loading port the Master considers that there is a danger of the Vessel being frozen in, and provided
that the Master or Owners immediately notify the Charterers thereof, the Vessel may leave with cargo loaded on
board and proceed to the nearest safe and ice free place and there await the Charterers' nomination of a safe and
accessible alternative port within 24 running hours, Sundays and holidays excluded, of the Master's or Owners'
notification. If the Charterers fail to nominate such alternative port, the vessel may proceed to any port(s),
whether or not on the customary route for the chartered voyage, to complete with cargo for the Owners'
account.
(b) Port of Discharge
(i) If the voyage to the discharging port is impeded by ice, or if on arrival the discharging port is inaccessible by
reason of ice, the Master or Owners shall notify the Charterers thereof, In such case, the Charterers shall have
the option of keeping the Vessel waiting until the port is accessible against paying compensation in an amount
equivalent to the rate of demurrage or of ordering the Vessel to a safe and accessible alternative port.
If the Charterers fail to make such declaration within 48 running hours, Sundays and holidays included, of the
Master or Owners having given notice to the Charterers, the Master may proceed without further notice to the
nearest safe and accessible port and there discharge the cargo.
(ii) If at any discharging port the Master considers that there is a danger of the Vessel being frozen in, and
provided that the Master or Owners immediately notify the Charterers thereof, the Vessel may leave with cargo
remaining on board and proceed to the nearest safe and ice free place and there await the Charterers'
nomination of a safe and accessible alternative port within 24 running hours, Sundays and holidays excluded, of
the Master's or Owners' notification. If the Charterers fail to nominate such alternative port, the vessel may
proceed to the nearest safe and accessible port and there discharge the remaining cargo.
(iii) On delivery of the cargo other than at the port(s) named in the contract, all conditions of the Bill of Lading
shall apply and the Vessel shall receive the same freight as if discharge had been at the original port(s) of
destination, except that if the distance of the substituted port(s) exceeds 100 nautical miles. the freight on the
cargo delivered at the substituted port(s) shall be increased proportionately.

43.   **Dispute Resolution**
This Contract shall be governed by and construed in accordance with English law.
Should the panics fail to reach a prompt amicable settlement (and without prejudice to either party's rights to
obtain urgent judicial relief), the parties hereby agree to refer all disputes to mediation. Unless the parties agree
forthwith on the appointment of a mediator, the parties hereby agree that the Honorary Secretary of the London
Maritime Arbitrators Association, on request of either party, is to appoint a mediator.
In the event that mediation is either rejected by one party or does not lead to a resolution within twenty-one
days, following the appointment of a mediator (unless the period is mutually extended), any dispute shall be
resolved by London arbitration as provided below.
1) All disputes arising out of or relating to this Contract where the total amount claimed (excluding interest and
costs) by either party does not exceed US$75,000 - shall be referred to arbitration in London and that reference
shall be in accordance with the LMAA Small Claims Procedure.
2) All other disputes, unless the parties agree forthwith on a single arbitrator, shall be referred to the final
arbitration of two arbitrators carrying on business in England who shall be members of the Baltic Exchange and
engaged in shipping and/or grain trades, one to be appointed by each of the parties with the power to such
arbitrators to appoint an umpire.
All claims under this Contract must be made in writing and any arbitration commenced within one year of final
discharge and where this provision is not complied with the claim(s) shall be deemed to be waived arid
absolutely barred. No arbitral award shall be questioned or invalidated on the ground that any of the arbitrators
is not qualified as above unless objection to his acting is taken within seven days of his appointment.

- 9 -

**JH Maritime Ltd**                                      7th **December 2006**

**Southern Chartering Tonnage TBN**

The parties are entitled, at any stage, to commence arbitration (so as to preserve time) notwithstanding ongoing amicable negotiation or mediation.

**44.    Commissions/Brokerage**
An address commission and brokerage as stated in Box 24 on the gross amount of freight, deadfreight shall be deducted by Charterer upon payment of same and is payable by Owner.

**45.    Vessel Requirement**
Vessel to be ITF (or equivalent)/ WWF/ AHL, DOC/ISM/ISPS compliant/fitted. Classed by Lloyds 100 AI or equivalent and P&I covered with bone fide club, max 25 yrs with steel holds suitable for load/discharge and carriage of nominated product(s)in bulk
Owners guarantee vessel to be SD/BC and tweendeck type. If so, all such vessels to be open hatch type with no obstructions in vessels holds. Vessels to be fully suitable to perform this trade and enter/load and discharge at the respective load and discharge ports. Vessel must have min. 2Omt cranes, fully serviceable and capable of loading respectively discharging the Charterers cargo.

**46.    Nomination Requirement**
On nomination the Owner is to provide;
* Full description of vessel including the vessels class and P&I club - in case the vessel has previously performed similar business for the Charterer then there is no need to repeat this requirement.
* ETS
* ETA Load ports
* ETA Respective Discharge ports

**47.    Cargo**
This COA is to cover the Charterer or their nominees below given exports from South Africa including but not limited to chrome cargoes including ferrochrome, charge chrome, chrome ore and if chrome ore is to be belt loaded same to be discussed on a case by case basis and mutually agreed. Bulk cargoes only. Cargo composition to be made up of multigrades of bulk product. It is explicitly understood that this contract is to cover parcels, which are to be loaded on a part or full cargo basis.
Min 15,000 mt blk ferroalloys per month but depending on actual availability and size of intended performing vessel Chtrs would try to maximise to suit.
With cargo composition to be made up with the following options:

| | |
|---|---|
| Tokuyama | abt 9/10,000 mt 1-2 grades chopt per shipment |
| Tobata | abt 3/7000 mt 2-3 grades chopt per shipment |
| Hikari | abt 4/5,000 mt lots 1-2 grades chopt per shipment |
| Kinuura | abt 2/3000 mt lots 1-2 grades chopt per shipment |
| Pohang | 5/15,000 mt lots chopt per shipment |

**48.    Load/Discharge Port Agents**
It is understood that, Bay Shipping are the clearing and forwarding agents appointing Charterers stevedores for loading of the vessels, Charterers appointing the vessels load port agents and Owners appointing the discharge port agents and the contractors for payloading and separation installations / removal as required on the vessels. All costs/time/expense for payloading and separation, including removal, to be for the Owners account.
In the event that ships gear breaks down any craneage employed in loading to be for the Owners account.

**FOR OWNERS**                                      **FOR CHARTERERS**

By Charterers Authority
For and on behalf of
JH Maritime Ltd

As agents